USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8 3 15

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- X

In re DANIEL GORDON,

    **Debtor.**

-------------------------------------------------------- X

**DANIEL GORDON,**

     **Appellant,**

 **- against -**

**ANGELA G. TESE-MILNER, TRUSTEE OF**
**THE ESTATE OF DANIEL GORDON,**

    **Appellee.**

-------------------------------------------------------- X

**OPINION AND ORDER**

**15-cv-1622 (SAS)**

**Chapter 7 Case**
**No. 09-16230**

**Adversary Proceeding**
**No. 10-3767**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.  INTRODUCTION

Daniel Gordon, a chapter 7 debtor,[1] appeals from a Judgment issued by Bankruptcy Judge Robert E. Gerber on January 15, 2015 sustaining the objection to discharge raised in an adversary proceeding by Angela G. Tese-Milner, Chapter 7 Trustee of the debtor's estate. The Judgment was entered following a bench trial in which the Trustee sought to prove the elements of

---

[1]   All statutory citations are to Title 11 of the United States Code.

1

subparagraphs (2) and (4) of section 727(a).  Section 727(a) provides that the court shall grant the debtor a discharge unless a plaintiff can show by a preponderance of the evidence that certain exceptions to discharge apply.  Under subparagraph (4), the court will sustain an objection to discharge if the debtor "knowingly and fraudulently, in or in connection with the case . . . made a false oath or account," and under subparagraph (2), the discharge will be denied if the debtor "with intent to hinder, delay, or defraud a creditor or an officer of the estate . . . has transferred . . . or concealed" property.

The bankruptcy court's post-trial findings of fact and conclusions of law detail the factual and legal bases for awarding judgment in favor of the Trustee.[2]  For the following reasons, the Judgment of the bankruptcy court is AFFIRMED.

## II.   BACKGROUND

In 1998, Gordon began working for Merrill Lynch where he ran the commodities division.[3]  After Merrill Lynch sold its trading business to Alleghany Energy Global Markets, Gordon became president of that subsidiary.  In 2003,

---

[2]     *See* 1/15/15 Decision After Trial ("Decision"), Ex. 11 to the Appendix to the Brief for the Appellee Angela G. Tese-Milner, Chapter 7 Trustee of the Estate of Daniel Gordon.

[3]     *See* 3/12/13 Trial Transcript ("Tr.") at 9:3–10.

Gordon pled guilty to three felonies: wire fraud in connection with a scheme to defraud Merrill Lynch of forty-three million dollars, money laundering, and conspiracy to defraud the United States.[4]  He served a twenty-two month prison term for these crimes.[5]

Subsequently, the IRS sued Gordon for unpaid taxes relating to the money he fraudulently obtained from Merrill Lynch.[6]  His attempts to settle failed, and with the tax case slated for trial, Gordon filed a petition for relief under Chapter 7 on October 18, 2009.[7]

On September 28, 2010, the Trustee brought the instant adversary proceeding to deny the debtor a discharge.[8]  The resulting trial was held on three grounds for relief:  failing to disclose assets with the intent to hinder, delay, or defraud creditors or a trustee under section 727(a)(2); transferring property with the intent to hinder, delay, or defraud creditors or a trustee under section 727(a)(2); and making materially false statements under oath under section 727(a)(4).[9]  The

---

[4]      *See* Decision at 3.

[5]      *See id.*

[6]      *See id.*

[7]      *See id.*

[8]      *See id.* at 4.

[9]      *See id.* at 4-5.

bankruptcy court ruled in Gordon's favor on the 'transfers' prong of section 727(a)(2).[10]  However, the bankruptcy court held under the 'concealment' prong of section 727(a)(2) that Gordon concealed, with the intent to defraud, the following property interests of companies he controlled: a two million dollar receivable relating to AllStar Capital Inc. ("AllStar"), the assets resulting from $650,000 in transfers relating to Citadel Construction Corporation ("Citadel"), and the assets resulting from a $500,000 transfer from the debtor to Wurk Times Square LLC ("Wurk TS").  The bankruptcy court further found that Gordon made material false oaths under section 727(a)(4) on his bankruptcy schedules and statements with respect to these same transactions, and with respect to his 2009 income, investments in Cascar LP ("Cascar") and Citadel, a $49,000 IRA contribution, and a $25,000 payment to Wachovia Bank ("Wachovia").[11]

## III.   STANDARD OF REVIEW

A district court functions as an appellate court in reviewing orders entered by bankruptcy courts.[12]  Findings of fact are reviewed for clear error,[13]

---

[10]     *See id.* at 37.

[11]     *See id.* at 37-38.

[12]     *See Hart Envtl. Mgmt. Corp. v. Sanshoe Worldwide Corp. (In re Sanshoe Worldwide Corp.)*, 993 F.2d 300, 305 (2d Cir. 1993).

[13]     *See* Federal Rule of Bankruptcy Procedure ("Fed. R. Bankr. P.") 8013.

whereas questions of law, or mixed questions of fact and law, are reviewed de novo.[14]  A district court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings."[15]

## IV.   APPLICABLE LAW

### A.   Chapter 7 Discharge and Challenges to Discharge

"Chapter 7 of the Bankruptcy Code is designed to provide individual debtors the opportunity for a 'fresh start' through the discharge of personal liability for pre-petition debts."[16]  Because a denial of that discharge is a harsh sanction, section 727 "must be construed strictly against those who object to the debtor's discharge and liberally in favor of the bankrupt."[17]  At the same time, "the discharge of a bankrupt from his debts is a privilege or favor that has been granted by Congress upon such terms as it has seen fit to impose," and "[a]mong these terms is the requirement that debtors act in good faith and provide full and honest

---

[14]    *See In re Adelphia Commc'ns Corp.*, 298 B.R. 49, 52 (S.D.N.Y. 2003) (citing *United States Lines, Inc. v. American S.S. Owners Mut. Prot. & Indem. Assoc. (In re United States Lines, Inc.)*, 197 F.3d 631, 640–41 (2d Cir. 1999)).

[15]    Fed. R. Bankr. P. 8013.

[16]    *Beer Sheva Realty Corp. v. Pongvitayapanu (In re Pongvitayapanu)*, 487 B.R. 130, 138 (Bankr. E.D.N.Y. 2013).

[17]    *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996) (quotation marks omitted).

5

disclosure."[18]  For this reason, it is often said that the discharge is a privilege reserved for the "'honest but unfortunate debtor.'"[19]

"When a creditor [or trustee] challenges a debtor's discharge, the standard of proof is the preponderance of the evidence and the burden of persuasion lies with the creditor."[20]  "The existence of fraudulent intent is a question of fact, and the creditor [or trustee] bears a considerable burden in demonstrating such intent."[21]

## B.    Section 727(a)(2):  Concealing Property

To prove a violation of section 727(a)(2), a plaintiff must show both an act (i.e., concealing) and an improper intent.  The statute requires actual intent to hinder, delay, or defraud creditors or the trustee.[22]  "Badges of fraud" have frequently been used as circumstantial evidence of fraudulent intent, and include:

    (1)    the lack or inadequacy of consideration;
    (2)    the family, friendship or close associate relationship

---

[18]     *Pongvitayapanu*, 487 B.R. at 138 (internal quotation marks omitted).

[19]     *Id.* (quoting *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) (citing *Grogan v. Garner*, 498 U.S. 279, 287 (1991)).

[20]     *Grogan*, 498 U.S. at 289.

[21]     *Dranichak v. Rosetti*, 493 B.R. 370, 379 (N.D.N.Y. 2013) (citing *Martin v. Key Bank (In re Martin)*, 208 B.R. 799, 806 (N.D.N.Y. 1997)).

[22]     *See Baron v. Klutchko (In re Klutchko)*, 338 B.R. 554, 570 (Bankr. S.D.N.Y. 2005).

between the parties;

(3)    the retention of possession, benefit or use of the property in question;

(4)    the financial condition of the party sought to be charged both before and after the transaction in question;

(5)    the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

(6)    the general chronology of the events and transactions under inquiry.[23]

Additionally, in *Salomon v. Kaiser* the court considered another factor: "[t]he shifting of assets by the debtor to a corporation wholly controlled by him."[24]  The badges can be applied in determining whether the debtor concealed assets, but many of the badges are more applicable in the transfer context.[25]

### C.    Section 727(a)(4):  False Oaths and Accounts

In general, "to establish a claim under Section 727(a)(4)(A), a plaintiff must prove a material false oath, knowingly and fraudulently made, in connection

---

[23]    *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582-83 (2d Cir. 1983).

[24]    *Id.* at 1583 (citing *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215 (1941)).

[25]    *See Painewebber Inc. v. Gollomp (In re Gollomp)*, 198 B.R. 433, 440 (S.D.N.Y. 1996).

with a bankruptcy case."[26]  "[O]nce the [plaintiff] has produced persuasive evidence of a false statement, the burden shifts to the debtor to come forward with evidence to prove that it was not an intentional misrepresentation or provide some other credible explanation."[27]

The first and second elements of Section 727(a)(4)(A) are self-explanatory and merely require that the debtor have made a statement under oath, and that the statement was false.  "A false statement or omission in the debtor's petition, schedules, or statements, satisfies the requirement of a false oath." [28]

The third element, requiring that the debtor knew that the statement was false, precludes inadvertent misrepresentations, or instances of mere carelessness or ignorance, from violating the statute.[29]  The court may consider the debtor's education and business experience in deciding whether he or she knew a

---

[26]     *Pongvitayapanu*, 487 B.R. at 139 (citing *O'Connell v. DeMartino (In re DeMartino)*, 448 B.R. 122, 127 (Bankr. E.D.N.Y. 2011)).

[27]     *Pereira v. Gardner (In re Gardner)*, 384 B.R. 654, 662 (Bankr. S.D.N.Y. 2008) (citing *Klutchko*, 338 B.R. at 567).

[28]     *Pongvitayapanu*, 487 B.R. at 140.  *Accord Forrest v. Bressler (In re Bressler)*, 387 B.R. 446, 460 (Bankr. S.D.N.Y. 2008).

[29]     See *Gardner*, 384 B.R. at 667 ("Intent under this section can be found based on a reckless disregard, but will not be found in cases of ignorance or carelessness.").

statement to be false.[30]

Under the fourth element, the debtor must have made the false statement with intent to defraud.  "Fraudulent intent, for purposes of Section 727(a)(4)(A), can be established by a showing of actual fraud, through evidence of the traditional badges of fraud, or by the debtor's reckless disregard for the truth of his statements."[31]  Although ignorance or carelessness alone is not sufficient to establish fraudulent intent,[32] multiple smaller falsehoods can aggregate into a "critical mass" that does indicate the requisite intent.[33]  Multiple omissions may also indicate fraudulent intent if there is something about the omitted information

---

[30]     *See In re Robinson*, 506 F.2d 1184, 1187 (2d Cir. 1974) (sustaining objections to the debtor's discharge and considering whether the debtor understood the questions being asked of him); *McCarthey Investments LLC v. Shah* (*In re Shah*), Bankr. No. 07-13833, 2010 WL 2010824, at *6 (Bankr. S.D.N.Y. May 13, 2010) ("[G]iven [Debtor]'s education, level of financial sophistication and appreciation of the significance of financial disclosure, the numerous misstatements depict a pattern which supports a finding of recklessness amounting to fraudulent intent."); *Zitwer v. Kelly* (*In re Kelly*), 135 B.R. 459, 463 (Bankr. S.D.N.Y. 1992) ("[A] debtor's education and business experience are factors to consider in determining whether he can appreciate what information must be disclosed.").

[31]     *Jacob Agai, 291 Ave P, LLC v. Antoniou (In re Antoniou)*, 515 B.R. 9, 24 (Bankr. E.D.N.Y. 2014).

[32]     *See Gollomp*, 198 B.R. at 437 (citing *Kelly*, 135 B.R. at 461; *MacLeod v. Arcuri (In re Arcuri)*, 116 B.R. 873, 885 (Bankr. S.D.N.Y. 1990)).

[33]     *Bressler*, 387 B.R. at 462.

9

the debtor might have wanted to conceal.[34]  Importantly, and in contrast to section 727(a)(2), the debtor's intent to defraud under 727(a)(4)(A) does not need to be directed at creditors or the trustee.

Under the fifth element, the debtor's statement must relate materially to the bankruptcy.  Materiality depends on whether the information is pertinent "to the debtor's business transactions, or if it concerns the discovery of assets, business dealings, or the existence or disposition of the debtor's property."[35]  A false statement or omission is material "if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property."[36]  It is well settled in the Second Circuit that "'[m]ateriality does not require a showing that the creditors were prejudiced by the false statement.'"[37]

---

[34]   *See Garcia v. Coombs (In re Coombs)*, 193 B.R. 557, 564-65 (Bankr. S.D. Cal. 1996) ("[T]here must be something about the adduced facts and circumstances which suggest that the debtor intended to defraud creditors or the estate [through his multiple omissions].").

[35]   *Gardner*, 384 B.R. at 667 ("Materiality is found if the false oath is related to the debtor's business transactions, concerns the discovery of assets, business dealings, or the existence or disposition of the debtor's property.").

[36]   *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984) (per curiam).

[37]   *Carlucci & Legum v. Murray (In re Murray)*, 249 B.R. 223, 229 (E.D.N.Y. 2000) (quoting *Robinson*, 506 F.2d at 1188).

Omissions that do not affect the value of the estate may nevertheless be material if they hinder the trustee's or creditor's ability to investigate the debtor's pre-bankruptcy dealings and financial condition, even if such an investigation would not have benefitted creditors.  Debtors are not permitted to pick and choose what information is worth disclosing because this "would create an end-run around [the] strictly crafted system" of bankruptcy administration.[38]  Finally, a multitude of individually immaterial omissions may, in the aggregate, be considered material.[39]

---

[38]     *Siegel v. Weldon (In re Weldon)*, 184 B.R. 710, 715 (Bankr. D.S.C. 1995).  *Accord Bressler,* 387 B.R. at 461 (denying discharge where debtor in "large part essentially assumes a trustee's role of deciding what information is relevant or material, and thus undercuts the central principles of chapter 7"); *Klutchko*, 338 B.R. at 568 ("Generally . . . it is not for the debtor to determine which assets should be disclosed to creditors . . . .  The debtor's duty is merely to answer truthfully.  It is left to the creditors or parties-in-interest to judge whether that information will aid them or prejudice them."); *Fokkena v. Peterson (In re Peterson)*, 356 B.R. 468, 478 (Bankr. N.D. Iowa 2006) (stating that debtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless) (citing *Kasden v. Kasden (In re Kasden)*, 209 B.R. 239, 243-44 (8th Cir. BAP 1997)).

[39]     *See Bressler*, 387 B.R. at 461–62 (holding that "otherwise immaterial falsehoods or omissions can aggregate into a critical mass substantial enough to bar a debtor's discharge") (citing *Bank of India v. Sapru (In re Sapru)*, 127 B.R. 306, 315-16 (Bankr. E.D.N.Y. 1991) ("It is this Court's decision that even if each falsehood or omission considered separately may be too immaterial to warrant a denial of discharge pursuant to § 727(a)(4)(A) certainly the multitude of discrepancies, falsehoods and omissions taken collectively are of sufficient materiality to bar the Defendant's discharge.")).

D.      **Issues Raised on Appeal**

The issues to be decided are (1) whether the Bankruptcy Judge erred when he found the necessary intent under sections 727(a)(2) and (4) based upon his findings that the debtor concealed assets and made multiple false oaths in connection with the bankruptcy filing; and (2) whether the Bankruptcy Judge erred when he found that certain transactions were not made in the ordinary course of business.

## V.      DISCUSSION

The bankruptcy court considered two days of trial testimony from the debtor and his counsel, as well as over seventy exhibits, and concluded in a well-reasoned thirty-nine page opinion that Gordon "made one decision after another to withhold disclosure of his financial dealings . . . and [ ] made it worse by providing excuses for the[se] failure[s] . . . that helped destroy his credibility . . . ."[40] Deference must be given to the bankruptcy court's credibility determinations. Based on my review of the Decision, I find no errors of law and that the bankruptcy court's factual findings were not clearly erroneous.

A.      **Section 727(a)(2) & (4):  Concealing Property & False Oaths**

The bankruptcy court based its denial of discharge under subsections

---

[40]      Decision at 2.

(2) and (4) on its finding that Gordon concealed transfers of two million dollars to AllStar, $650,000 to Citadel Construction, and $500,000 to Wurk TS — companies that Gordon controlled — and that the concealment and the false oaths were material and not inadvertent.

### 1. Gordon's Concealment of and Failure to Disclose the AllStar Loan

On October 22, 2008, Gordon loaned AllStar two million dollars. Gordon did not list the Allstar loan in response to question 10 of the Statement of Financial Affairs, which calls for the debtor to "list all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within two years immediately preceding the commencement of the case."[41]  Gordon also failed to list the transfer on the appropriate schedules or amended schedules (the "schedules").

Gordon argues that the bankruptcy court failed to consider that Gordon acted reasonably when he did not record the transfer to AllStar on the Bankruptcy Statements because it was a fully repaid loan.  At trial, Gordon relied on a schedule that he produced during discovery ("AllStar Schedule") purporting

---

[41]     Gordon also filed an Amended Statement of Financial Affairs and a Second Amended Statement of Financial Affairs, neither of which included the subject transactions.  For ease of reference, I will refer to the statements collectively as the "SOFA."

to show AllStar's repayment of the loan.  The payments reflected on the AllStar
Schedule total more than the two million dollars that Gordon had loaned to AllStar.

The bankruptcy court expressly rejected this contention.[42]  Among
other findings, the bankruptcy court stated that Gordon received no promissory
note for what was a very large loan and that no contemporaneous documentation
was prepared to reflect the existence of any loan or of AllStar's supposed
repayments.[43]  Further, the bankruptcy court did not credit the AllStar Schedule,
finding that it was prepared long after the supposed loan and repayments and was
intended solely to aid Gordon's case in the bankruptcy court.  Put simply, the
bankruptcy court found that the AllStar Schedule — which was Gordon's sole
evidence that the large transfer was actually a loan and that it was fully repaid —
was in fact a "fabrication."[44]

Gordon also argues that the loan was made in the ordinary course of
business and thus was exempt from disclosure.  However, the bankruptcy court
noted that Gordon could not specify any other loans of any amount that he

---

[42]     *See* Decision at 6.

[43]     *See id.* at 7-8.

[44]     *Id.* at 8-9.

14

personally made to AllStar.[45]  All previous loans made to AllStar came from

Gordon Family I, LP ("GFI") of which Gordon was a limited partner.  The largest

of these loans by GFI was not more than $500,000.[46]  On this basis, the bankruptcy

court drew the fair conclusion that there was no "meaningful factual predicate" to

find that the singular transfer of such a large sum of money was in the ordinary

course of business.[47]

> Gordon also argues that the AllStar receivable was valueless.  AllStar

had no remaining assets, and thus the debt was not collectable.  Gordon reasons

that he had no incentive to conceal the receivable and thus the bankruptcy court

could not demonstrate the requisite intent.  However, the two million dollar "loan"

from Gordon to AllStar was "re-loaned" to a company called Urban Muse, and that

re-loan remained outstanding on the date that Gordon filed his Bankruptcy

Statements.[48]  As the bankruptcy court found, this re-loan should have been noted

in Gordon's Bankruptcy Statements.  For these reasons, the bankruptcy court's

findings regarding the AllStar transfer were not clearly erroneous.

---

[45]     *See id.* at 9.

[46]     *See id.* at 7, 9.

[47]     *Id.* at 9.

[48]     *See id.* at 7; 3/12/13 Tr. at 79:2–5.

15

### 2. Gordon's Concealment of and Failure to Disclose the Citadel and Wurk TS Transactions

Gordon failed to list transfers totaling approximately $650,000 to Citadel on his SOFA and statements. Gordon argues that he was not required to list these transfers because Citadel was Wurk's creditor, not Gordon's. According to Gordon, the transfers to Citadel were made to satisfy the obligations of Gordon affiliate Wurk TS that had engaged Citadel to perform construction services. Gordon characterized the Citadel Transfers as infusions of equity capital to Wurk TS's parent company, even though the funds were remitted directly to Citadel. For convenience's sake, Gordon says that he transferred the funds directly to Citadel instead of transferring the funds to Wurk TS first and then having Wurk TS transfer them to Citadel. In sum, Gordon contends that *Wurk TS* held a debt — not Gordon — and thus Citadel was never Gordon's creditor. But Gordon admitted on the statements that Citadel *was* his creditor.[49] Gordon attempts to reconcile his testimony with this disclosure by claiming that Citadel was listed as a creditor because Gordon was a guarantor on certain other debts of Citadel. But under either scenario — Citadel would still be a creditor of Gordon because of the guaranty obligation.

---

[49]     *See, e.g.*, Summary of Schedules filed in Bankr. No. 09-16230 (S.D.N.Y.) (Dkt. No. 22).

Gordon also argues that because the Citadel transfers were of no value to him, he had no incentive to hide the receivables. However, a "recalcitrant debtor may not escape . . . a denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless business relationship or holding; such a defense is specious."[50]

Gordon also failed to list transfers totaling approximately $500,000 to Wurk TS. He argues that the bankruptcy court erred in denying a discharge because the court did not consider the transfer to Wurk TS in context with Gordon's transfers to other ventures. In support, Gordon cites to *Stamat v. Neary* for the proposition that the ordinary course of business defense refers to "normal commercial and financial relationships . . . and that factors to consider include the length of time the parties were engaged in the type of transaction at issue, whether the amount or form of tender differed from past practices, and whether the debtor engaged in any unusual collection or payment activity."[51] The *Stamat* court stated that a transfer of funds between the debtor's personal account and the corporations

---

[50]   *TD Bank v. Nazzaro (In re Nazzaro)*, No. 10-74869, 2013 WL 145627, at *7 (Bankr. E.D.N.Y. Jan. 14, 2013).

[51]   Brief for the Appellant Daniel Gordon ("Opening Mem.") at 17 (citing *Stamat v. Neary*, 635 F.3d 974, 980 (7th Cir. 2011) (quotation marks omitted)).

controlled by the debtor is not part of the ordinary course of business.[52]  Here, the Wurk TS and Citadel transfers were admittedly transfers by Gordon to corporations that he controlled; therefore, even under the precedent relied on by Gordon, the transfers were not in the ordinary course of business.

The bankruptcy court found that, based on the testimony and evidence admitted, transfers of the size here — at least $1,150,000 — were too large to innocently overlook.  Accordingly, the bankruptcy court's conclusions regarding Citadel and Wurk TS were not clearly erroneous.

**B.      Section 727(a)(4):  False Oaths**

In addition to finding false oaths under section 727(a)(4) in connection with the transactions just discussed, the bankruptcy court found false oaths with respect to Gordon's misstatement of his 2009 income by several hundred thousand dollars in response to Question 1 of the SOFA and in his schedules, and his failure to disclose investments in Cascar and Citadel, a $49,000 IRA contribution, and a $25,000 re-payment on a line of credit to Wachovia in response to Question 18 of the SOFA and in his schedules.

**1.      Gordon's Misstatement of His Income**

Gordon makes two arguments with respect to the bankruptcy court's

---

[52]      *See Stamat*, 635 F.3d at 981.

finding that the misstatement of his 2009 income was a false oath under section 727(a)(4).  *First*, he argues that although his statement of income was technically imperfect,[53] under the totality of circumstances, the misreporting of income is insufficient to warrant denial of discharge.  According to Gordon, the misrepresentation of income on the SOFA and his statements did not relate materially to his bankruptcy case.  To support his argument, Gordon notes that the bankruptcy court stated that "income may not be as important as assets in a chapter 7 case."[54]  However, the bankruptcy court held that "the understatement of income [by Gordon is] very serious, and among the most serious of his many disclosure deficiencies."[55]  I agree.  As the bankruptcy court explains, Gordon's wrongful disclosure "painted a dramatically different picture of his financial condition" than it was in reality and that such wrongful disclosure "was not responsive" to the information requested by the SOFA.[56]

  *Second*, Gordon argues that despite the plain language of the SOFA,

---

[53] Gordon implausibly contends that despite reporting income of $635,000 on his 2009 tax return, he believed that his SOFA disclosure of $150,000 in income was correct because the additional income was a result of one-time payments.

[54] Opening Mem. at 21.

[55] Decision at 22.

[56] *Id.*

which requires debtors to list their "gross income," he did not know that this requirement applied to him because he had provided the Trustee with a copy of his tax return.[57]  However, the 2009 tax return was filed approximately one year after the statements were filed.  In other words, the record amply supports the conclusion that Gordon intentionally and knowingly misrepresented his income in the SOFA and statements, and then attempted to shift the burden to the Trustee to determine his true income.  Gordon cites no authority that would permit such a burden shift.  Gordon also contends that his misstatement of income is excusable because his disclosure was based on counsel's advice, but the bankruptcy court's finding that Gordon was a sophisticated businessman[58] negates this argument.[59]  Accordingly, the bankruptcy court did not err in finding that Gordon's misstatement of his income was a material false oath under section 727(a)(4).

---

[57]    *See* Tr. at 12:4–6.

[58]    *See* Decision at 23 n.71.

[59]    *See Ng v. Adler (In re Ng)*, 518 B.R. 228, 245–46 (E.D.N.Y. 2014) ("Adler asserts that he relied upon his counsel and that he provided much of the information.  Here, however, Adler was a sophisticated businessman, educated enough to understand the petition and information that he approved of within the bankruptcy petition.  Moreover, one's reliance on counsel does not equate to absolute entitlement to a discharge.  Where, as here, a brief review of the bankruptcy documents would have revealed to Adler that there were material omissions, advice of counsel will not overcome the inference of fraudulent intent.") (citations omitted).

### 2.   Gordon's Failure to Disclose Entities in Which He Had An Interest[60]

#### a.   Citadel

Gordon argues that he did not have to list Citadel on the SOFA because Citadel had only one elected officer — David Stack.  In support, Gordon points to Stack's testimony that he was the sole officer of Citadel.  However, at trial, the Trustee introduced fifteen documents signed by Gordon on Citadel's behalf as principal and secretary.[61]  The bankruptcy court also found that Gordon owned an interest in Citadel indirectly through his positions in GFI, which owned McCann Construction LLC ("McCann").  McCann owned between fifty and one hundred percent of Citadel during the relevant period.[62]  The bankruptcy court credited this evidence.  The bankruptcy court's finding that the Trustee met her

---

[60]    The Trustee addresses several entities, including McCann Construction LLC, Hilltop Investments LLC, Boulder Heights Owner LLC, Phoenix Capital Advisors, Inc., Eastern Energy, and King Holdings, LLC, that Gordon only cursorily mentions in the introduction to section F of his opening memorandum.  *See* Opening Mem. at 21.  Because Gordon only states that "[a]ccording to the Trustee, Debtor failed to list the . . . entities" and does not make any argument as to why the bankruptcy court erred in its findings of fact and conclusions of law regarding those entities, Gordon has not raised any issues as to them on appeal.  *Id.*

[61]    *See* Brief for the Appellee Angela G. Tese-Milner, Chapter 7 Trustee of the Estate of Daniel Gordon, at 24.

[62]    *See* Decision at 27.

21

burden to show that Gordon made a false oath regarding Citadel was not clearly erroneous.

### b.    Cascar[63]

Gordon contends that he did not disclose his interest in Cascar because that interest was nominal.  According to Gordon, the purpose of Cascar was to hold an ownership interest in two seats on the New York Mercantile Exchange ("NYMEX") for the benefit of his ex-wife and daughter.  Accordingly, Gordon argues that he had no motive to intentionally fail to list his ownership of Cascar in the Bankruptcy Statements or to defraud creditors or the Trustee.  The bankruptcy court considered and rejected this argument.[64]

Gordon's argument rests on the assumption that his only interest is a direct financial interest.  But as he makes clear, Cascar was created partially for the benefit of his child — in whose well-being he certainly has an interest.  Gordon could very well have wanted to hide Cascar from the Trustee, fearing that its value would be used to satisfy his creditors and thus could no longer benefit his child.  And even if Gordon did not have a direct financial interest, such a status does not

---

[63]    Cascar was formed in December 2009.  Gordon was a general partner and initially held a 98.5% interest in it.

[64]    *See* Decision at 26-27.

absolve him of responsibility to make full and accurate disclosures on his

Bankruptcy Statements.[65]  Accordingly, I find no error in these rulings.

### 3. Gordon's Failure to Disclose Individual Retirement Account Contributions and Wachovia Payments

Gordon contends that he did not have to disclose a contribution of

$49,000 to his IRA and a $25,000 payment to Wachovia to pay down his home

equity line of credit in 2009 because they were part of the ongoing process in

which he managed his business affairs.  The bankruptcy court found that Gordon's

reasons for non-disclosure here were "absurd."[66]  In particular, the bankruptcy

court did not credit Gordon's testimony that he believed that the term "other

transfers" on the SOFA referred to non-cash transfers as "no reasonable person

could regard transfers of personal property to be covered while transfers of cash

would not be."[67]  Likewise, the bankruptcy court did not credit Gordon's testimony

that the contribution and payment were in the ordinary course because Gordon

---

[65]     *See Congress Talcott Corp. v. Sicari (In re Sicari),* 187 B.R. 861, 878 (Bankr. S.D.N.Y. 1994) (sustaining a discharge where a debtor who had a personal interest in a property transferred the property just prior to filing a bankruptcy petition — but kept a beneficial or equitable interest — and then attempted to conceal that remaining interest).

[66]     Decision at 10.

[67]     *Id*.

offered no facts to support this conclusion. The bankruptcy court's findings

regarding these omissions are not clearly erroneous.

## VI.  CONCLUSION

For the foregoing reasons, the Judgment of the bankruptcy court is

AFFIRMED.  The Clerk of the Court is directed to close this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            August 3, 2015

24

**-Appearances-**

**For Appellant:**

Donald N. David, Esq.
Akerman LLP
666 Fifth Ave., 20th Fl.
New York, NY 10103
(212) 880-3800

**For Appellee:**

Yann Geron, Esq.
Fox Rothschild LLP
100 Park Ave., Ste. 1500
New York, NY 10017
(212) 878-7900